TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
        1100/1300 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-6527/3819
        Facsimile: (213) 894-6269/0141
        E-mail:    Scott.Paetty@usdoj.gov/Brian.Faerstein@usdoj.gov

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
        1400 New York Avenue NW, 3rd Floor
        Washington, DC 20530
        Telephone: (202) 320-0539
        Facsimile: (202) 514-0152
E-mail:    Christopher.Fenton@usdoj.govv

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                    UNITED STATES DISTRICT COURT

                FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-579(A)-SVW |
|---|---|
|            Plaintiff, | GOVERNMENT'S OPPOSITION TO DEFENDANT AYVAZYAN'S AND DEFENDANT TERABELIAN'S MOTION TO SUPPRESS (ECF 146, 153); DECLARATIONS OF CHRISTOPHER FENTON AND TIMOTHY MASSINO; EXHIBITS |
|                 v. | |
| RICHARD AYVAZYAN, | |
|   aka "Richard Avazian" and | |
|     "Iuliia Zhadko," | Hearing Date: April, 12, 2021 |
| MARIETTA TERABELIAN, | Hearing Time: 11:00 a.m. |
|   aka "Marietta Abelian" and | Location:    Courtroom of the |
|     "Viktoria Kauichko," | Hon. Stephen V. |
| ARTUR AYVAZYAN, | Wilson |
|   aka "Arthur Ayvazyan," and | |
| TAMARA DADYAN, | |
| MANUK GRIGORYAN, | |
|   aka "Mike Grigoryan," and | |
|     "Anton Kudiumov," | |
| ARMAN HAYRAPETYAN, | |
| EDVARD PARONYAN, | |

1   aka "Edvard Paronian" and
      "Edward Paronyan," and
2  VAHE DADYAN,

3         Defendants.

4

5     Plaintiff United States of America, by and through its counsel

6  of record, the Acting United States Attorney for the Central District

7  of California and Assistant United States Attorneys Scott Paetty and

8  Brian Faerstein, and United States Department of Justice Trial

9  Attorney Christopher Fenton, hereby files its Opposition to defendant

10  Richard Ayvazyan's Motion to Suppress (ECF No. 146), which defendant

11  Marietta Terabelian has joined (ECF No. 153).

12     This opposition is based upon the attached memorandum of points

13  and authorities, the Declaration of Christopher Fenton and attached

14  //

15  //

16

17

18

19

20

21

22

23

24

25

26

27

28

exhibits, the Declaration of Timothy Massino, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: March 18, 2021          Respectfully submitted,

TRACY L. WILKISON
Acting United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

_____/s/_____

SCOTT PAETTY
BRIAN FAERSTEIN
Assistant United States Attorneys
CHRISTOPHER FENTON
Department of Justice Trial Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                        PAGE

I.    INTRODUCTION ................................................. 1

II.   STATEMENT OF FACTS ........................................... 2

      A.   The Investigation ..................................... 2

      B.   Criminal History, Firearm Possession and Ties to
           Organized Crime....................................... 4

      C.   The Complaint......................................... 6

      D.   The Search Warrant ................................... 7

      E.   The Search............................................ 9

III.  ARGUMENT ................................................... 11

      A.   The Search Warrant Is Sufficiently Particular........... 13

      B.   The Search Warrant Is Not Overbroad .................... 17

      C.   The Execution of the Search Warrant Was Reasonable....... 23

      D.   No Evidence Should Be Excluded Because the Agents
           Acted in Good Faith ................................... 24

      E.   The Government Obtained an Order Extending Its Time to
           Review Digital Devices for Responsiveness ............... 25

IV.   CONCLUSION ................................................. 25

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

**Federal Cases**

<u>Horton v. California</u>,
   496 U.S. 128 (1990) ........................................... 20

<u>Illinois v. Gates</u>,
   462 U.S. 213 (1983) ........................................... 20

<u>United States v. Adjani</u>,
   452 F.3d 1140 (9th Cir. 2006) ................................. 12

<u>United States v. Banks</u>,
   556 F.3d 967 (9th Cir. 2009) .................................. 12

<u>United States v. Duong</u>,
   156 F. Supp. 2d 564 (E.D. Va. 2001) ........................... 23

<u>United States v. Fannin</u>,
   817 F.2d 1379 (9th Cir. 1987) ................................. 13

<u>United States v. Gourde</u>,
   440 F.3d 1065 (9th Cir. 2006) ................................. 20

<u>United States v. Hayes</u>,
   794 F.2d 1348 (9th Cir. 1986) ................................. 13

<u>United State v. Holzman</u>,
   871 F.2d 1496 (9th Cir. 1989) ......................... 20, 22, 24

<u>United States v. Leon</u>,
   468 U.S. 897 (1984) ...................................... 24, 25

<u>United States v. Riley</u>,
   906 F.2d 841 (2d Cir. 1990) ......................... 13, 15, 22

<u>United States v. Rude</u>,
   88 F.3d 1538 (9th Cir. 1996) ............................. 12, 16

<u>United States v. SDI Future Health, Inc.</u>,
   568 F.3d 684 (9th Cir. 2009) .................................. 13

<u>United States v. Spilotro</u>,
   800 F.2d 864 (9th Cir. 1986) ............................... 12-13

<u>United States v. Ventresca</u>,
   380 U.S. 102 (1965) ........................................... 20

<u>United States v. Wey</u>,
   256 F. Supp. 3d 355 (S.D.N.Y. 2017) ....................... passim

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                              PAGE

**Federal Statutes**

15 U.S.C. § 645 ..............................................  8

18 U.S.C. § 1014 .............................................  8

18 U.S.C. § 1028A ............................................  8

18 U.S.C. § 1343 .............................................  7

18 U.S.C. § 1344 .............................................  7

18 U.S.C. § 1349 .............................................  7

18 U.S.C. §§ 1956 (a) ........................................  8

18 U.S.C. §§ 1956 (h) ........................................  8

iii

I.    **INTRODUCTION**

The warrant at issue authorized the search of a mansion purchased by defendant Richard Ayvazyan ("R. Ayvazyan") and his wife Marietta Terabelian ("Terabelian") (collectively, "defendants"), using COVID-19 disaster relief funds, for items related to the scheme to fraudulently obtain those funds.  Defendants are convicted felons with a history of possessing firearms and ties to the "Armenian Power" gang.  On the morning of the search, an FBI SWAT team initially entered to secure the property and ensure officer safety.  Recorded aerial surveillance showed that, as SWAT approached the house, defendant Terabelian abandoned her family to run into the back yard to throw a grocery bag containing around $450,000 in cash into the bushes and her iPhone into the grass.  Federal agents, supervised by the warrant's affiant, conducted a search of approximately 6,000 square feet in 5.5 hours and made a limited seizure of only 49 items.

The items seized include an iPhone that defendant R. Ayvazyan purchased while on pretrial release that contains digital contraband in violation of his conditions, records documenting the use of disaster relief funds to purchase the mansion that was searched, 60 gold bullion coins purchased shortly before the search using disaster relief funds, and a U.S. passport card that defendant R. Ayvazyan had failed to relinquish to his Pretrial Services Officer.

The search warrant is amply supported by probable cause, and was executed in a targeted fashion by federal agents who acted pursuant to the terms of the warrant in a professional manner and with good faith that the warrant, which was authorized by U.S. Magistrate Judge Sagar, was valid.  For all of these reasons, the Court should deny defendants' motion to suppress.

1  II.   **STATEMENT OF FACTS**

2       A.   **The Investigation**

3       In June 2020, the government opened an investigation into a Los

4  Angeles-based ring that was using stolen, fake, and synthetic

5  identities to fraudulently apply for COVID-19 relief funds.

6  (Declaration of Timothy Massino ("Massino Decl.") ¶ 1.)  The original

7  subjects included "Iuliia Zhadko" (later determined to be a fake

8  identity), who submitted fraudulent loan applications on behalf of

9  numerous shell companies.  (Id. ¶ 2.)

10      Over the next four months, the government served over 200

11 subpoenas, obtaining information from federal and state agencies,

12 lenders, retail banks, and escrow companies, among others.  (Id.

13 ¶ 3.)  The investigation identified dozens of additional fraudulent

14 loan applications that had been submitted using fake and stolen

15 identities, such as "Viktoria Kauichko," on behalf of fake businesses

16 or businesses whose identities had been stolen.  (See generally ECF 1

17 ("Ayvazyan Compl."); United States v. Dadyan, et al., 20-mj-5321

18 (filed Nov. 3, 2020), ECF 1 ("Dadyan Compl.").)  The investigation

19 also revealed that fraudulent documents had been submitted in support

20 of the applications, including fake driver's licenses, federal tax

21 forms, payroll reports, and bank statements. (Affidavit, In the

22 Matter of the Search of 4910 Topeka Drive Tarzana California 91356,

23 No. 2:20-MJ-05282 ("SW Aff.") ¶¶ 29, 41-42, 50.)

24      The investigation determined that four residences were being

25 used in connection with fraud, including a house in Encino where

26 defendants R. Ayvazyan and Terabelian lived, a house in Encino where

27 defendants A. Ayvazyan and T. Dadyan lived, and two apartments in

28 Woodland Hills.  (SW Aff. ¶¶ 8-11, 17, 39, 47, 52.)  The

investigation revealed that these addresses were used in connection with the fraudulent loan applications or with the bank accounts used to receive and launder the criminal proceeds, or both.  (Id.)  Some of the residences were also used as the purported home address for "Iuliia Zhadko" and "Viktoria Kauichko."  (Id. ¶¶ 47, 51-52, 54, 57.) Law enforcement agents traced the funds and learned that a substantial amount of the proceeds had been laundered through various bank accounts, including a bank account in defendant Terabelian's name, and had been used by her husband, defendant R. Ayvazyan, to purchase several luxury properties, including:

    (i)    a $3.25 million, approximately 6,000 square foot, estate in Tarzana that defendants and their coconspirators purchased in the names of defendants R. Ayvazyan and Terabelian ("SUBJECT PREMISES-1");

    (ii)    a $1 million luxury home in Glendale that defendants and their co-conspirators purchased in the name of "Iuliia Zhadko"; and

    (iii)    an $868,000 luxury home in Woodland Hills that defendants and their coconspirators purchased in the name of "A.M." (which appears to be a stolen identity).

(Ayvazyan Compl. ¶¶ 5, 16-26, 27-33; Dadyan Compl. ¶¶ 5, 23-24, 47; SW Aff. ¶¶ 5-7, 23, 26-29, 34.)

The investigation also revealed that a substantial portion of the stolen disaster relief funds had been funneled through various bank accounts, including a bank account opened in the name of defendant Terabelian's father, N.T., after he was deceased, and used to purchase over $400,000 in goods from jewelers.  (SW Aff. ¶ 62.f.) The stolen disaster relief funds were also used to purchase luxury watches (that were delivered to one of defendant R. Ayvazyan's properties), luxury home furnishings, and other luxury personal items.  (SW Aff. ¶ 62.f.)  Large amounts of the fraudulently obtained

3

disaster relief funds had not yet been located and were believed to have been liquidated to cash.  (SW Aff. ¶¶ 62.f-g.)

Law enforcement agents began conducting surveillance on the seven properties, including, in some instances, to search the trash left outside for pickup.  (SW Aff. ¶¶ 25, 32-33, 35, 38, 43-44, 59.) Surveillance yielded additional evidence that further confirmed the relationship between the properties and their use as part of the fraud, including documents addressed to the names of fake or stolen businesses that had applied for PPP and EIDL loans, mail addressed to fake and stolen identities including "Iuliia Zhadko" and "Viktoria Kauichko" alongside mail addressed to R. Ayvazyan and A. Ayvazyan, and a copy of a fraudulent driver's license and social security card belonging to another individual altogether.  (SW Aff. ¶¶ 33, 43-44.)

### B.   Criminal History, Firearm Possession and Ties to Organized Crime

As part of its investigation, law enforcement conducted background checks which revealed that, in 2012, defendants R. Ayvazyan and Terabelian both pled guilty to conspiracy to commit bank fraud for their role in a four-year scheme to defraud several financial institutions.  (See United States v. Ayvazyan, et al., CR 11-180-CJC (CDCA).)  As part of their pleas, defendants R. Ayvazyan and Terabelian admitted to lying on applications and providing false documentation to obtain mortgage loans and lines of credit.  (Id., ECF 55, 58.)  Among other things, they provided falsified W-2s and federal tax returns, and defendant R. Ayvazyan admitted enlisting his mother to falsely represent to a bank that she was not related to him.  (Id., ECF 58.)

1    At the time that he pled guilty, defendant R. Ayvazyan owned at

2    least five firearms including: one Taurus Forjas 38 Caliber Revolver;

3    one semi-automatic Carl Walther P99 Pistol; one semi-automatic Kie

4    Kimber Pistol; one semi-automatic Sig Sauer Pistol; and one Smith and

5    Wesson Revolver. (Declaration of Christopher Fenton ("Fenton Decl.")

6    ¶ 1, Ex. 1.)  After entering his plea, he purportedly sold or

7    transferred his firearms to his brother, defendant A. Ayvazyan, who

8    lived in the same neighborhood.  (Id.)  A background check on A.

9    Ayvazyan as of October 27, 2020, showed that he had previously owned

10    at least one semi-automatic Carl Walther P99 Pistol. (Id., Ex. 2.)

11    Surveillance also revealed that defendants R. Ayvazyan and

12    Terabelian had ties to known associates of the "Armenian Power" gang.

13    Specifically, surveillance of the Glendale property purchased in the

14    name of R. Ayvazyan's alias, "Iuliia Zhadko," identified a black

15    Mercedes SUV parked in the driveway that was registered to R.

16    Ayvazyan's brother-in-law and purported business partner, A.P.  (SW

17    Aff. ¶¶ 35-37.)  A.P. had been married to defendant Terabelian's

18    sister, G.T., who is listed by the U.S. Postal Service as a recipient

19    of mail at the Glendale property.  (Id.)  In 2013, A.P. pled guilty

20    to racketeering conspiracy charges related to the "Armenian Power"

21    criminal enterprise.  (Id. (referencing United States v. Darbinyan,

22    et al., 11-cr-72, ECF 2598).)  Specifically, A.P. admitted he was an

23    associate of the "Armenian Power" gang and had abetted the illegal

24    possession of a firearm by one of the gang's leaders.  (Id.)

25    While defendant R. Ayvazyan, defendant Terabelian, and A.P. are

26    felons and thus prohibited from owning firearms or ammunition,

27    searches of the trash outside the Glendale property that defendants

28    had purchased in the name of R. Ayvazyan's alias, "Iuliia Zhadko,"

revealed empty packages of carbine rifle attachments to include a CTR Stock, an AR-15 pistol grip attachment, a carbine handguard, and a carbine charging handle.  (SW Aff. ¶ 38; Fenton Decl. ¶ 3, Ex. 3.) An empty box of 9mm ammunition was also discovered along with various pieces of mail with the identifying information removed.  (Id.)

As discussed below, when executing the search warrants for SUBJECT PREMISES-1 and defendant A. Ayvazyan's property, among others, an FBI SWAT team made the initial entrance to secure the properties and ensure the safety of the officers who would conduct the searches.  These steps proved necessary: (i) at SUBJECT PREMISES-1, agents found a gun safe and receipts showing that, in August 2020, defendant R. Ayvazyan had purchased accessories designed to store firearms in the safe (Fenton Decl. ¶¶ 4-5, Exs. 4, 5); (ii) at A. Ayvazyan's property, agents found an arsenal of 12 firearms, ammunition, empty magazines, and a gun safe (Massino Decl. ¶ 8); and (iii) at the Woodland Hills property purchased using the stolen identity of "A.M.", agents found one Glock 27, .40 Caliber Pistol (Fenton Decl. ¶ 6, Ex. 6).

C.    **The Complaint**

In October 2020, in the midst of the COVID-19 pandemic, defendants R. Ayvazyan and Terabelian left their children in Los Angeles to go on a luxury vacation to Turks and Caicos.  On or about October 19, 2020, upon being stopped by Customs and Border Protection ("CBP") while re-entering the United States at the Miami International Airport, defendants R. Ayvazyan and Terabelian were found to be in possession of contraband, including credit cards in the names of "Iuliia Zhadko" and "Viktoria Kauichko."  CBP turned

1  defendants R. Ayvazyan and Terabelian over to the FBI, who made a

2  probable cause arrest.  (Ayvazyan Compl. ¶ 41.)

3      Later that day, the government filed a complaint against

4  defendants R. Ayvazyan and Terabelian.  (See Ayvazyan Compl.)  The

5  complaint summarized in detail the evidence establishing probable

6  cause that defendants R. Ayvazyan and Terabelian participated in a

7  massive conspiracy to commit wire fraud and bank fraud.  (Id.)  The

8  complaint detailed the manner and means of the conspiracy (repeated

9  fraudulent applications for disaster relief loans), provided specific

10  examples of fraudulent loan applications defendants had submitted,

11  and traced the flow of disaster relief funds, including to use as a

12  down payment to purchase SUBJECT PREMISES-1.  (Id.)

13      **D.   The Search Warrant**

14      The search that is the subject of defendants' motion was

15  authorized by the Honorable Alka Sagar, United States Magistrate

16  Judge, based on an affidavit sworn out by FBI Special Agent Justin

17  Palmerton.  The affidavit incorporated the detailed complaint by

18  reference and attached a copy as an exhibit.  (SW Aff. ¶ 20; Ex. 1.)

19  The warrant authorized the search of SUBJECT PREMISES-1, which was

20  the residential property described in Attachment A-1, for items

21  described in Attachment B.

22      Attachment B limited the agents' discretion to search by clearly

23  identifying the criminal activity being investigated and by providing

24  an express limitation on the relevant time period.

25      The first sentence of Attachment B states: "[t]he items to be

26  seized are evidence, contraband, fruits, or instrumentalities of

27  violations of 18 U.S.C. § 1343 (Wire Fraud); 18 U.S.C. § 1344 (Bank

28  Fraud); 18 U.S.C. § 1349 (Conspiracy to Commit Wire and Bank Fraud);

18 U.S.C. §§ 1956(a) and (h) (Money Laundering and Conspiracy to
Commit Money Laundering); 18 U.S.C. § 1014 (False Statements to a
Financial Institution); 18 U.S.C. § 1028A (Aggravated Identity
Theft); and 15 U.S.C. § 645(A) (False Statements to the Small
Business Administration) ... occurring on or after January 1, 2020."

Attachment B then lists specific items to guide the agents
conducting the search to determine what they have the authority to
seize.  The items clearly relate to the fraudulent scheme, which is
straightforward: defendants submitted fraudulent loan applications
using fake and stolen identities, laundered the proceeds, and then
spent the money for their personal benefit.

For example, the first item seeks records relating to the names
of the fake and stolen businesses used to fraudulently apply for
loans and launder and misuse the proceeds.  (Attachment B ¶ 1.a.)

Other items to be seized relate directly to defendants'
laundering and misuse of the proceeds.  For example, the warrant
provides for the seizure of records relating to the purchase of real
estate, luxury watches, jewelry, and/or precious metals since March
1, 2020, based on probable cause set forth in the affidavit showing
that defendants actually used the proceeds to buy such items.
(Attachment B ¶¶ 1.h, 1.n; SW Aff. ¶¶ 5-7, 20, 23, 30-31, 62.f.)
Similarly, the warrant provides for the seizure of cash in amounts
greater than $1,000 because: (i) "[i]ndividuals who commit financial
crimes including loan fraud will often liquidate criminal proceeds to
cash ... in order to launder the proceeds and profit from the
crimes"; and (ii) in this particular case, there remains a large
amount of proceeds that law enforcement has not yet located, that

1    defendants could use to flee the jurisdiction.  (Attachment B ¶ 1.r;

2    SW Aff. ¶¶ 62.f-g.)

3        Attachment B also provides that agents may seize digital devices

4    found on defendants R. Ayvazyan and Terabelian, or at SUBJECT

5    PREMISES-1, based on several of the affiant's statements about the

6    role that digital devices play in the scheme, including that:

7    "[e]vidence of digital and virtual submissions, such as the

8    fraudulent PPP and EIDL loan applications, are likely to be stored on

9    digital devices that subjects were using to apply for these loans and

10   direct the transfer of the funds."  (SW Aff. ¶ 62.a.)  Attachment B

11   also sets forth special procedures relating to the search of digital

12   devices, including permitting the agents who conduct the search to

13   seize and transport the digital devices offsite for examination.

14   (Attachment B ¶¶ 4-8.)

15        **E.    The Search**

16        On November 5, 2020, federal law enforcement executed the

17   search warrant on SUBJECT PREMISES-1.  As described above, in light

18   of the size of the residence (approximately 6,000 square feet) and

19   concerns about firearms and links to "Armenian Power," an FBI SWAT

20   team initially entered the property to secure it and ensure the

21   safety of the officers who would conduct the actual search.  (Massino

22   Decl. ¶¶ 4-6.)  To protect officer safety, the SWAT team disabled

23   security cameras.  (Id.)  The presence of a tactical unit and

24   disabling of security cameras are commonly used methods to protect

25   law enforcement agents when executing warrants.  (Id. ¶ 7.)  Recent

26   events underscore the importance of these tactics for officer safety.

27   For example, on the morning of February 2, 2021, two FBI special

28   agents were shot and killed while serving a warrant on a child

pornographer who is believed to have monitored the approach of the agents with a doorbell camera and ambushed the agents through the unopened door with an assault-style rifle.[1]

Defendant Terabelian had apparently been notified by other coconspirators, whose homes were searched earlier that morning, that law enforcement agents were on their way to search SUBJECT PREMISES-1.  As law enforcement drove up to the property, aerial video footage captured defendant Terabelian running out of the back door of the residence and throwing an object into the bushes in the back yard, before running around to the front yard to meet the arriving agents.  (Fenton Decl. ¶ 7, Ex. 7.)  When agents later searched the bushes, they found a grocery bag filled with nearly $450,000 in cash.  (Id. ¶ 8, Ex. 8.)  Agents also found defendant Terabelian's iPhone nearby in the grass.  (Id. ¶ 9, Ex. 9.)

The affiant and another case agent were present at SUBJECT PREMISES-1 and supervised the search from start to finish.  (Fenton Decl. ¶ 10, Ex. 10.)  The search of the approximately 6,000 square foot mansion began at around 7:45am Pacific and was completed approximately 5.5 hours later.  (Id.)  The agents who conducted the search seized only 49 items from SUBJECT PREMISES-1. (Fenton Decl. ¶ 11, Ex. 11.)  The items seized generally fell into four categories: (i) digital devices; (ii) cash and cash equivalents (i.e., gold coins, watches and jewelry); (iii) financial records; and (iv) identification documents.  (Id.)

Examples of the items seized include:

---

[1] See, e.g., "2 FBI agents killed, three wounded while serving warrant. Gunman, now dead, shot them through the door," Miami Herald, Feb. 3, 2021, available at www.miamiherald.com/news/local/crime/article248942479.html.

- defendant R. Ayvazyan's new iPhone, which contained digital photographs of credit cards belonging to "Iuliia Zhadko" and "Viktoria Kauichko" in violation of his conditions of pretrial release (Id. ¶ 12, Ex. 12);

- a new iPhone that defendant Terabelian threw into her backyard when law enforcement arrived to conduct the search of SUBJECT PREMISES-1 (Id. ¶ 9, Ex. 9);

- a grocery bag containing nearly $450,000 of cash that defendant Terabelian threw into the bushes in her backyard when law enforcement arrived to conduct the search of SUBJECT PREMISES-1 (Id. ¶ 8, Ex. 8);

- defendant R. Ayvazyan's passport card, which he failed to surrender as part of the conditions of his release from custody on the Complaint (Id. ¶ 13, Ex. 13);

- gold coins believed to have been purchased with disaster relief funds fraudulently obtained using defendant Terabelian's deceased father's identity; and

- financial records showing the source of funds (namely disaster relief loan proceeds) used by defendants R. Ayvazyan and Terabelian to purchase SUBJECT PREMISES-1 (Id. ¶ 14, Ex. 14).

The remainder of the items seized are all similarly within the scope of the search warrant, which is amply supported by probable cause in all respects.

**III. ARGUMENT**

The Fourth Amendment concepts of particularity and overbreadth are distinct. "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the

11

requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." United States v. Banks, 556 F.3d 967, 972-73 (9th Cir. 2009) (citation omitted).

With respect to particularity, a warrant "need only be reasonably specific, rather than elaborately detailed." United States v. Rude, 88 F.3d 1538, 1551 (9th Cir. 1996) (citation omitted). Specificity is a case-specific determination and "varies depending on the circumstances of the case and the type of items involved." Id. (quoting United States v. Spilotro, 800 F.2d 959, 963 (9th Cir. 1986)).

The Ninth Circuit generally considers three factors when determining whether a warrant is sufficiently particular: "(1) whether probable cause exists to seize all items of a particular type described in the warrant; (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not; and (3) whether the government was able to describe the items more particularly in light of the information available to it at the time the warrant was issued." United States v. Adjani, 452 F.3d 1140, 1148 (9th Cir. 2006) (quoting Spilotro, 800 F.2d at 963)).

Notably, "[w]arrants which describe generic categories of items are not necessarily invalid if a more precise description of the items subject to seizure is not possible." Spilotro, 800 F.2d at 963. As the Second Circuit explained, even though descriptions of categories of documents to be seized, including illustrations, may not "eliminate all discretion of the officers executing the warrant, . . . the particularity requirement is not so exacting . . . The Fourth Amendment is not violated because the officers executing the

12

warrant must exercise some minimal judgment as to whether a particular document falls within the described category." United States v. Riley, 906 F.2d 841, 844-45 (2d Cir. 1990).

As for overbreadth, the Ninth Circuit has explained that a "warrant must not only give clear instructions to a search team, it must also give legal, that is, not overbroad, instructions." United States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th Cir. 2009). Under the Fourth Amendment, "this means that there [must] be probable cause to seize the particular thing[s] named in the warrant." Id. (citation omitted). "The number of files that could be scrutinized . . . is not determinative. The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant." United States v. Hayes, 794 F.2d 1348, 1355 (9th Cir. 1986).

A warrant that, standing on its own, might be overbroad may still be valid when one of three factors are satisfied: (1) the warrant describes in "detail the items one commonly expects to find on premises used for the criminal activities in question," or (2) the warrant refers to specific criminal activities, or (3) a descriptive affidavit is attached to and incorporated in the warrant. United States v. Fannin, 817 F.2d 1379, 1384 (9th Cir. 1987) (citing Spilotro, 800 F.2d at 864, 867).

**A.   The Search Warrant Is Sufficiently Particular**

The fraud alleged in the search warrant affidavit is simple and straightforward: defendants used fake and stolen identities to fraudulently apply for disaster relief loans on behalf of sham companies that do not actually have business operations or activities.  Defendants then laundered the funds through bank

13

accounts belonging to these and other sham companies and used them for their personal benefit.  The search warrant that Judge Sagar authorized begins by articulating the specific crimes under investigation by reference to statute, and prescribes time-frame criteria: January 1, 2020 through the present.  (Attachment B.)  The first item then provides the searching agents with a specific illustration of the types of records they should seize – i.e., records relating to the sham companies involved in fraudulently obtaining and laundering disaster relief proceeds:

> Records or items concerning ABC Realty Advisors, Allstate Towing and Transport, Crystalcare Home Health, EM Construction, Fadehaus Barbershop, Fiber One Media, G&A Diamonds, Inception Fund, Journeymen Construction, Nelson's Nursery, Redline Auto Mechanics Inc., Runyan Tax Services, Secureline Realty and Funding, Timeline Transport, VB Trucking, TM Events, Top Quality Contracting, or any affiliated entities or individuals;

(Attachment B ¶ 1.a.)

Defendants' primary argument that the search warrant lacks particularity is based on a hyper-technical interpretation of the language in this paragraph in an effort to arrive at an absurd result.  (ECF 146 at 14-15.)  They incorrectly claim that this list includes defendants R. Ayvazyan and Terabelian and thus gives the officers discretion to seize any item related to defendants R. Ayvayzyan and Terabelian anywhere in their own home.  Defendants cite to United States v. Wey, which defendants argue is a case in which a district court invalidated a "nearly identical" search warrant.  (Id. (citing 256 F. Supp. 3d 355 (S.D.N.Y. 2017).)  Defendants are wrong.

First, the search warrant attachment in Wey expressly included among its first few entries a corporate entity whose premises was the subject of one search together with individuals whose residence was

the subject of another search.  256 F. Supp. 3d at 365.  In Wey, this
created a "circular structure" whereby the would-be constraint
imposed in the search warrant was no constraint at all.  Id. at 386.
Not so here.  Defendants' claim that the search warrant that Judge
Sagar authorized in this case is "nearly identical" is false: the
paragraph they reference does not expressly include defendant R.
Ayvazyan or Terabelian.  (Attachment B ¶ 1.a.)

Second, to the extent that defendants suggest the paragraph at
issue could be expansively read to implicitly and indirectly include
defendants R. Ayvazyan and Terabelian because it uses the phrase "and
any affiliated entities or individuals," that argument should be
rejected.  None of these sham companies purportedly employed
defendant Terabelian.  And none purportedly employed defendant R.
Ayvazyan with the exception of Inception Fund, which was a shell
company used to launder stolen disaster relief funds to buy SUBJECT
PREMISES-1.  Moreover, to the extent this paragraph could be
interpreted to permit the seizure of records relating to R. Ayvazyan,
the proper reading would be to limit that seizure to documents
relating to his involvement with the Inception Fund as it relates to
the specific enumerated crimes.  See, e.g., Riley, 906 F.2d at 844-45
(explaining that the Fourth Amendment is not violated because the
officers executing the warrant must exercise some minimal judgment as
to whether a particular document falls within the described
category).  That the searching agents applied the common sense
approach dictated by the plain and unambiguous language as opposed to
defendants' absurdist reading is evidenced by the fact that the
searching agents seized less than ten items consisting of hard copy
documents.  (Fenton Decl. ¶ 11, Ex. ¶ 11.)  Importantly, defendants

do not cite any examples of documents that were improperly seized under their incredible interpretation, but should not have been.

Further distinguishing <u>Wey</u> from the current case, the search warrant there "did not specify the crimes under investigation, whether by statutory citation or otherwise, or discuss any particular conduct of interest.  It did not set out any date ranges or other timeframe-based criteria.  Importantly, [it] also did not attach, incorporate, or otherwise expressly reference the [] Affidavit."  256 F. Supp. 3d at 365.  The search warrant that Judge Sagar authorized, however, did all three things that the search warrant in <u>Wey</u> did not.

Notably, the search warrants in <u>Wey</u> also were not "nearly identical" to those authorized by Judge Sagar because the allegations are completely different.  In <u>Wey</u>, the search warrants related to an actual business that participated in a complex securities fraud scheme involving over 200 entities and individuals.  256 F. Supp. 3d at 362-63.  Here, the government alleges a simple and straightforward fraud involving fake companies that did not actually have legitimate business activities.  The searching agents in this case thus were not presented with the types of judgment calls that they might otherwise encounter when searching through the records of a real business operation that was involved in criminal activities.

Moreover, even if defendants were correct that the warrant was broad (which it was not), where the "central purpose" of the business was the criminal activity under investigation, an "extraordinarily broad seizure of documents" is permissible.  <u>United States v. Rude</u>, 88 F.3d 1538, 1551 (9th Cir. 1996).

Defendants also raise particularity challenges to a small number of other paragraphs; however, these challenges lack credibility

16

because they are not based on the actual language used by the search warrant. (ECF 146 at 11.) For example, defendants challenge the particularity of paragraph 1.i, which they claim calls for the seizure of "[a]ny 'financial records' including tax, bank, corporate, and 'other financial records' regardless of which person or company they regarded." (Id.) That is not what paragraph 1.i says. Rather, it calls for the seizure of "Records or items concerning the creation, alteration, falsification, or use of tax documents, bank records or other financial records, payroll reports or other payroll records, or other financial or corporate records," which, in the context of the specific alleged offenses and time-frame related criteria, is sufficiently particular: all these businesses were fake or otherwise involved in criminal activity and the specified documents were of the kind defendants used in furtherance of the alleged scheme. In any event, defendants do not specifically allege that any of the hard copy documents that were seized were actually beyond the scope of the warrant.[2] Instead, defendants focus almost exclusively on the cash and jewelry.

B. The Search Warrant Is Not Overbroad

Defendants' challenges to the breadth of the search warrant focus predominantly on the seizures of certain digital devices as well as cash and luxury items believed to have been obtained through their scheme. Defendants' arguments fail on this ground as well.[3]

---

[2] Defendants also complain that the item calling for the seizure of travel records and passports was improper because it includes children's passports. Defendants were required to relinquish their children's passports as part of their conditions of release in order to minimize the risk of flight. (ECF 44-45, 47-48.)

[3] Defendants retread the same arguments based on their misreading of Wey in their overbreadth challenge as they do in their

*(footnote cont'd on next page)*

First, defendants argue that the search warrant was overbroad because agents seized iPhones that they purchased following their release on bond pending trial in this case. (ECF 146 at 9.) The search warrant that Judge Sagar authorized specifically provided for the seizure of "[a]ny digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof." (Attachment B at ¶ 1.t.) The application also specifically sought authorization, which Judge Sagar granted, to search the persons of defendants R. Ayvazyan and Terabelian for digital devices, based on the affiant's statements that "[e]vidence of digital and virtual submissions, such as the fraudulent PPP and EIDL loan applications, are likely to be stored on digital devices that subjects were using to apply for these loans and direct the transfer of the funds." (SW Aff. ¶¶ 12, 14, 62.b.) Even further, the affidavit explained that "[s]pecific evidence in this case indicates R. AYVAZYAN and TERABELIAN used the aliases 'Iuliia Zhadko' and 'Viktoria Kauichko' to apply for fraudulent PPP loans," and that evidence of that use could be in digital form. (Id. ¶ 62.d.) When agents seized defendant R. Ayvazyan's new iPhone, a manual search immediately revealed that his new iPhone contained new photos of multiple credit cards in the names of "Iuliia Zhadko" and "Viktoria Kauichko," in violation of the conditions of his release. (Fenton Decl. ¶ 12, Ex. 12.) When agents went to seize defendant Terabelian's new iPhone, they learned that she had thrown it in the backyard near the bag of cash that she

particularity challenge. (ECF 146 at 17.) For the reasons stated above, defendants' attempt to analogize this case to Wey should be rejected.

attempted to hide from law enforcement. (Id. ¶ 9, Ex. 9.) There was undoubtedly probable cause to seize both iPhones pursuant to the search warrant.[4]

Second, defendants argue that the search warrant was overly broad because it permitted seizure of the aforementioned grocery bag containing $450,000 in cash that defendant Terabelian threw into the bushes when law enforcement arrived at SUBJECT PREMISES-1 to conduct the search. (ECF 146 at 10, 18-20.) This argument is based on the inaccurate claim that the affidavit stated that defendants spent all of the criminal proceeds to purchase real estate, furnishings, and jewelry, and that there is thus no probable cause to believe that any cash remained. (Id. at 19-20.) To the contrary, the affidavit established probable cause to seize the $450,000 in cash based on the statements that: (i) "[i]ndividuals who commit financial crimes including loan fraud will often liquidate criminal proceeds to cash ... in order to launder the proceeds and profit from the crimes"; and (ii) "the criminal conduct [in this case] involves a large amount of fraud proceeds, a large portion of which, at this point, law enforcement has not been able to locate." (SW Aff. ¶¶ 62.f-g.) The affidavit need not have detailed the specific method of demonstrating probable cause that defendants demand – namely a list of ATM withdrawals. (ECF 146 at 19-20.) Nor did Judge Sagar require such analysis before finding probable cause authorizing the warrant.

---

[4] Defendant R. Ayvazyan also claims there was no probable cause to seize his daughter's iPhone. (ECF 146 at 9.) He is wrong. As he well knows, he has a history of using the names of family members – living and dead – in furtherance of his schemes. For example, as referenced in the complaint incorporated into the search warrant affidavit and above, as part of his plea in 2012, defendant R. Ayvazyan admitted to using his mother's identity in furtherance of scheme to defraud financial institutions. (Ayvazyan Compl. ¶ 42.)

United States v. Ventresca, 380 U.S. 102, 109 (1965) (reviewing court should not "invalidate the warrant by interpreting the affidavit in a hypertechnical, rather than a commonsense, manner").

Rather, the affidavit, which alleges the specific crimes of money laundering and a conspiracy to commit money laundering, provides ample evidence that there is a fair probability that defendants engaged in a massive scheme to steal and launder millions of dollars, and that a "large amount" of that money has not yet been identified and that some portion of that money was at SUBJECT PREMISES-1.[5] (See, e.g., SW Aff. ¶¶ 3,20-21, 62.b-d, f-g; Ayvazyan Compl. ¶¶ 22, 26, 40.) This is more than sufficient to establish probable cause to seize the grocery bag of cash found in the bushes. See United State v. Holzman, 871 F.2d 1496, 1509 (9th Cir. 1989), abrogated on other grounds by Horton v. California, 496 U.S. 128 (1990) ("[B]ecause the affidavit described the large quantities of cash carried by appellants at the time of their arrest, and that counterfeit credit cards were being used to obtain cash advances, we are satisfied that probable cause existed to support the search for cash.").[6] Moreover, defendant Terabelian's efforts to conceal the

---

[5] Determinations of probable cause must be upheld if, under the "totality of the circumstances" surrounding a request, the issuing magistrate had a substantial basis for finding probable cause. Illinois v. Gates, 462 U.S. 213, 238-39 (1983). The "totality of circumstances" test requires only a "fair probability" that the sought-after evidence is located in a particular place. United States v. Gourde, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc) (citing Gates, 462 U.S. 213 at 246).). "Fair probability" does not require "certainty or even a preponderance of the evidence." Id.

[6] As also explained in the affidavit, the possession of travel documents and cash can be evidence of "perpetrator's plans to leave the jurisdiction, which is particularly common for perpetrators of financial crimes of the magnitude being investigated in this case."

(footnote cont'd on next page)

money from law enforcement at the search site further supports findings of probable cause and reasonableness.

Third, defendants also argue that the search warrant was overbroad to the extent it permitted seizure of 60 gold coins, claiming that the gold coins were purchased prior to the alleged scheme. (ECF 146 at 7-9.) In support, defendants point only to the fact that the gold coins were dated 1979-1987. (Id.) Defendants' claim is specious. The dates on the gold coins say nothing about when the coins were actually purchased or by whom. Moreover, as detailed in the affidavit, the investigation revealed that a substantial portion of the stolen disaster relief funds had been funneled through a bank account opened in the name of defendant Terabelian's father, N.T., after he was deceased, and used to purchase over $400,000 in goods from jewelers. (SW Aff. ¶ 62.f.) Two checks written out of N.T.'s account show that in August 2020, a total of $122,960 in disaster relief funds were used to buy exactly 60 gold coins. (Fenton Decl. ¶ 15, Ex. 15.)[7]

Finally, defendants challenge as overbroad the seizure of certain luxury watches and jewelry, arguing that the warrant did not provide sufficient guidance to provide searching agents with a basis to distinguish between those items purchased prior to and during the alleged scheme. (ECF 146 at 18-20.) The affidavit, however, clearly

---

(SW Aff. ¶ 62.g.) Here, in addition to the grocery bag of $450,000 in cash, law enforcement seized defendant R. Ayvazyan's U.S. passport card, which he had been ordered to relinquish to his Pretrial Services Officer, but did not. (Fenton Decl. ¶ 13, Ex. 13.)

[7] In the first superseding indictment, defendants R. Ayvazyan and Terabelian are charged with aggravated identity theft for using N.T.'s name after he died in July 2020 to fraudulently apply for disaster relief loans. (ECF 154.)

established probable cause to believe defendants were using

fraudulently obtained funds to buy luxury watches and jewelry:

> Here, records from financial institutions have revealed
> that numerous checks totaling in the hundreds of thousands
> of dollars have been sent to diamond retailers in both Los
> Angeles and New York.  Additionally, records from Radius
> Bank and luxury watch retailers, indicate that for the
> last several months, R. AYVAZYAN has been using
> fraudulently obtained loan proceeds to purchase luxury
> watches.

(SW Aff. ¶ 62.f.)  Because the affidavit established probable cause

to search for luxury watches and jewelry, the affiant included these

categories of items in Attachment B.  The Ninth Circuit has approved

of the use of such generic classifications, like "jewelry," where the

affidavit establishes probable cause to believe such items are

proceeds of a crime and present at the search site, particularly when

exact descriptions of the jewelry are not available.  See Holzman,

871 F.2d at 1509 ("Such use of generic classifications [like jewelry]

... has been found acceptable by other courts.  Under the

circumstances of this case, if probable cause existed to search for

cash, jewelry, bonds, and notes ..., a more particular description

would not have been possible. ... As a result, we do not find [the

description of items to be seized] to be overbroad.")  Given the

large amount of money being used to make these purchases – which

totaled in the hundreds of thousands of dollars – it is simply not

reasonable to expect that the government would be able to obtain

exact descriptions.  That the searching agents were required to

exercise some minimal level of judgment with an approved

classification for which probable cause undoubtedly exists does not

invalidate the warrant.  See Riley, 906 F.2d at 844-45.

1    As with Wey, defendants' reliance on United States v. Duong, is

2    misplaced.  (ECF 146 at 18 (citing 156 F. Supp. 2d 564, 568 (E.D. Va.

3    2001)).)  In Duong, the affiant mistakenly used a standard drug

4    search warrant attachment, not one specifically tailored to the

5    robbery at issue in that case, and as a result, included certain

6    broad categories of items that were not related to the crime, which

7    was also not specified in the warrant.  156 F. Supp. 2d at 567–68.

8    In addition, when executing the warrant, the searching agents seized

9    thousands of documents unrelated to the robbery, including documents

10   relating to a legitimate business run by members of the defendant's

11   family who were not involved in the alleged crimes.  Id. at 572.

12   Here, the warrant was purposefully drafted to authorize seizure of

13   specific items related to the simple and straightforward scheme under

14   investigation and clearly included a list of specific crimes.

15   Moreover, the search yielded 49 items, less than ten of which

16   contained records.  (Fenton Decl. ¶ 11, Ex. 11.)

17   **C.   The Execution of the Search Warrant Was Reasonable**

18       Defendants' argument that the searching agents "seiz[ed]

19   everything in sight" (ECF 146 at 20), is directly refuted by the

20   facts: after searching a nearly 6,000 square foot estate, agents

21   seized only 49 items.  (Fenton Decl. ¶ 11, Ex. 11.)

22   Defendants' argument that the searching agents showed "flagrant

23   disregard" for defendants' fundamental rights and the terms of the

24   warrant (ECF 146 at 20-21), is also directly refuted by the record.

25   The use of the FBI SWAT team was necessary to ensure officer safety

26   in light of concerns about defendants' possession of firearms and

27   ties to "Armenian Power."  The searching agents' seizure of

28   defendants' and their daughter's iPhones was expressly permitted by

23

the warrant.  (Attachment B ¶¶ 1.t, 3, 4.a.)  And, for all of the

reasons explained above, the searching agents had probable cause to

seize luxury watches and jewelry based on the language used in the

warrant that is entirely consistent with Ninth Circuit law.  See

Holzman, 871 F.2d at 1509.

Defendant claims that the searching agents should not have

seized jewelry while simultaneously seizing receipts that proved the

jewelry was purchased long before the alleged scheme.  (ECF 146 at

21.)  Defendants, however, point only to five receipts and, in light

of defendants' history of falsifying records, such receipts are

inherently suspect.  In addition, these receipts are not dispositive

of ownership as defendants suggest here.  At least one of the

purported receipts states that the jewelry at issue was sold to

"Arman," not defendants.  (See Ayvazyan Decl. Ex. D.)  And while

another states that defendant Terabelian purchased the watch in

question, further investigation revealed that the primary account

holder for the account to which it was charged is another individual

– "S.M." – whose email address is linked to Fiber One Media, one of

the sham companies that submitted fraudulent loan applications.

(Fenton Decl. ¶ 16; Ex. 16.)[8]

**D.  No Evidence Should Be Excluded Because the Agents Acted in Good Faith**

In the context of a search warrant, the evidence obtained by law

enforcement is still admissible where agents relied in good faith on

the validity of the warrant issued by a neutral magistrate.  See

---

[8] Defendants also proffer pictures that purportedly show that they owned certain luxury watches and jewelry before the alleged scheme.  As a general matter, the photographs do not provide clear depictions of the items at issue and the digital photographs do not have reliable date stamps as presented.

United States v. Leon, 468 U.S. 897, 923 (1984).  Under Leon, agents conducting a search pursuant to a validly issued warrant are entitled to rely on the search warrant unless: (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth;" (2) "the issuing magistrate wholly abandoned his judicial role;" (3) the warrant was "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" or (4) the warrant failed to "particularize the place to be searched or things to be seized."  Id.  Here, defendants do not allege any basis to support a finding that the search warrant was not validly issued. Accordingly, the Court should conclude that the agents acted in good faith and deny defendants request to suppress evidence.

### E.   The Government Obtained an Order Extending Its Time to Review Digital Devices for Responsiveness

Defendants' argument that all digital devices not marked responsive by March 5, 2021 should be returned regardless of suppression is based on the original 120 day deadline set forth in Attachment B of the search warrant.  (ECF 146 at 23.)  Defendants' argument is moot, however, because the government properly sought and obtained an order extending the deadline to complete the review by another 120 days.  As set forth in the order, the government now has until July 3, 2021 to complete its review for responsiveness.  See Order, In re Search Warrants, No. 2:20-mj-05282.

## IV.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court deny defendants' motion to suppress.