TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT PAETTY (Cal. Bar No. 274719)
CATHERINE AHN (Cal. Bar No. 248286)
BRIAN FAERSTEIN (Cal. Bar No. 274850)
Assistant United States Attorneys
Major Frauds/Environmental and Community Safety Crimes Sections
     1100/1300 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone: (213) 894-6527/2424/3819
     Facsimile: (213) 894-6269/0141
     E-mail:    Scott.Paetty@usdoj.gov
               Catherine.S.Ahn@usdoj.gov
               Brian.Faerstein@usdoj.gov

JOSEPH S. BEEMSTERBOER
Acting Chief, Fraud Section
Criminal Division, U.S. Department of Justice
CHRISTOPHER FENTON
Trial Attorney, Fraud Section
Criminal Division, U.S. Department of Justice
     1400 New York Avenue NW, 3rd Floor
     Washington, DC 20530
     Telephone: (202) 320-0539
     Facsimile: (202) 514-0152
     E-mail:    Christopher.Fenton@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## UNITED STATES DISTRICT COURT

### FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>       v.<br><br>MARIETTA TERABELIAN,<br>  aka "Marietta Abelian" and<br>    "Viktoria Kauichko,"<br><br>       Defendant. | No. CR 20-00579-SVW-3<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MARIETTA TERABELIAN; DECLARATION OF CATHERINE AHN WITH ATTACHED EXHIBITS 1 AND 2 (FILED UNDER SEAL)<br><br>Sentencing: November 15, 2021<br>Time:      11:00 a.m.<br>Location:  Courtroom of the<br>           Hon. Stephen V. Wilson |

1    Plaintiff United States of America, by and through its counsel

2 of record, the Acting United States Attorney for the Central District

3 of California, Assistant United States Attorneys Catherine Ahn, Scott

4 Paetty, and Brian Faerstein, and Department of Justice Trial Attorney

5 Christopher Fenton, hereby files its sentencing position regarding

6 defendant Marietta Terabelian.

7    The government's sentencing position is based upon the attached

8 memorandum of points and authorities, the declaration of Catherine

9 Ahn and accompanying exhibits, the presentence investigation report,

10 the files and records in this case, and any other evidence or

11 argument that the Court may wish to consider at the time of

12 sentencing.  The government reserves the right to file any

13 supplemental sentencing positions that may be necessary.

Dated:  November 10, 2021        Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 SCOTT M. GARRINGER
                                 Assistant United States Attorney
                                 Chief, Criminal Division

                                 _____/s/_____
                                 CATHERINE AHN
                                 SCOTT PAETTY
                                 BRIAN FAERSTEIN
                                 Assistant United States Attorneys
                                 CHRISTOPHER FENTON
                                 Department of Justice Trial Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES..............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION...................................................1

II.   RELEVANT FACTUAL AND PROCEDURAL HISTORY........................2

      A.   Defendant's Charges, Convictions, and Motions............2

      B.   The PSR, Objections, and the Defense Sentencing
           Position.................................................5

III.  THE COURT SHOULD ADOPT THE PSR AND GOVERNMENT'S RECOMMENDED
      GUIDELINES CALCULATION........................................7

      A.   The Conspirators' Attempts to Obtain Approximately
           $20.1 Million in Fraudulent Loans and Launder the
           Received Funds was Reasonably Foreseeable to Defendant....7

           1.   A Preponderance of the Evidence Standard Applies
                at Sentencing Based on Clear Ninth Circuit
                Precedent...........................................7

           2.   The Court Should Adopt the Findings of the PSR
                with Respect to the Scope of Defendant's Relevant
                Conduct.............................................9

      B.   The PPP Lenders are Victims under Ninth Circuit
           Precedent...............................................13

      C.   The Court Should Adopt the Enhancements for
           Sophisticated Means, Possession and Use of
           Authentication Features, and Decline to Apply a
           Mitigating Role Reduction...............................16

           1.   The Court Should Adopt the PSR's Recommendation
                that the Sophisticated Means Enhancement Should
                Apply Pursuant to U.S.S.G. § 2B1.1(b)(10)(A)(i).....16

           2.   The Court Should Adopt a +2 Enhancement for
                Possession or Use of an Authentication Feature
                Pursuant to U.S.S.G. § 2B1.1(b)(11)(A)(ii).........17

           3.   A Mitigating Role Reduction Should Not Apply.......18

      D.   The Court Should Apply the Vulnerable Victims
           Enhancement Pursuant to U.S.S.G. § 3A1.1(b)(1)..........18

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                                PAGE

IV.   THE GOVERNMENT'S SENTENCING RECOMMENDATION....................20

      A.    262 Months' Imprisonment Is Sufficient But Not More
            than Necessary to Meet the Goals of 18 U.S.C.
            § 3553(a)...............................................20

            1.    Defendant's Essential Role in the Crimes, Prior
                  Conviction, and Current Flight from Supervision
                  Support the USPO and Government's Recommendation....21

            2.    Defendant's Crimes Occurred During, and Took
                  Advantage of, an Unprecedented Economic Disaster
                  to Fund a Lavish Lifestyle While Fellow Americans
                  Were Suffering.....................................23

            3.    Defendant Should be Held Accountable for
                  $16,464,071.26 in Restitution and Forfeiture........25

V.    CONCLUSION................................................25

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

**CASES**

<u>Gall v. United States</u>, 552 U.S. 38 (2007)...........................20

<u>Molina-Martinez v. United States</u>, 136 S.Ct. 1338 (2016)...........20

<u>United States v. Armstead</u>, 552 F.3d 769 (9th Cir. 2008).............9

<u>United States v. Berger</u>, 587 F.3d 1038 (9th Cir. 2009)..............9

<u>United States v. Blitz</u>, 151 F.3d 1002 (9th Cir. 1998)...............9

<u>United States v. Carty</u>, 520 F.3d 984 (9th Cir. 2008)...............20

<u>United States v. Cuellar</u>, 165 F.3d 918 (9th Cir. 1998)
      (unpublished)...............................................19

<u>United States v. Harrison-Philpot</u>, 978 F.2d 1520 (9th Cir. 1992)....8

<u>United States v. Hymas</u>, 780 F.3d 1285 (9th Cir. 2015)...............8

<u>United States v. Jordan</u>, 256 F.3d 922 (9th Cir. 2001)...............8

<u>United States v. Lloyd</u>, 807 F.3d 1128 (9th Cir. 2015)...............9

<u>United States v. Mercado</u>, 474 F.3d 654 (9th Cir. 2007)............20

<u>United States v. Miller</u>, 953 F.3d 1095 (9th Cir. 2020).............9

<u>United States v. Parlor</u>, 2 F.4th 807 (9th Cir. 2021)................8

<u>United States v. Pham</u>, 545 F.3d 712 (9th Cir. 2008)............14, 15

<u>United States v. Riley</u>, 335 F.3d 919 (9th Cir. 2003).............7, 8

<u>United States v. Treadwell</u>, 593 F.3d 990 (9th Cir. 2010)........8, 9

<u>United States v. Watts</u>, 519 U.S. 148 (1997).......................20

**STATUTES**

18 U.S.C. § 3553(a)..................................20, 21, 23, 24

**OTHER AUTHORITIES**

U.S.S.G. § 1B1.3....................................................9

U.S.S.G. § 2B1.1..............................................13, 17

U.S.S.G. § 3A1.1..............................................19, 20

**TABLE OF AUTHORITIES (CONTINUED)**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

U.S.S.G. § 3B1.2.....................................................18

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3        On June 25, 2021, a jury convicted defendant Marietta Terabelian

4  ("Terabelian") of conspiring with her husband, Richard Ayvazyan, her

5  brother-in-law Artur Ayvazyan, her sister-in-law Tamara Dadyan and

6  Tamara Dadyan's cousin, Vahe Dadyan, and others to use real and false

7  personal identifiers to create false and synthetic identities and

8  businesses, submit fraudulent Paycheck Protection Program ("PPP") and

9  Economic Injury Disaster Loan ("EIDL") applications on behalf of

10  those fictitious entities as well as businesses they controlled,

11  obtain and spend the fraudulent loan proceeds, and launder those

12  proceeds through bank accounts.  (ECF 1125, Revised Presentence

13  Investigation Report ("PSR") ¶¶ 16-70.)  Defendant and her husband

14  absconded from supervision shortly after the Court denied their post-

15  trial motions, and despite the issuance of warrants for their arrest,

16  remain at large.  (PSR ¶¶ 8, 75-77.)

17        For this conduct, the government and the United States Probation

18  Office ("USPO") recommend the Court impose a total sentence of 262

19  months' imprisonment, at the low-end of defendant's advisory

20  guidelines range based on a criminal history category of I and total

21  offense level of 39, and five years of supervised release, with the

22  conditions recommended by the USPO.[1]  (See ECF 1124, USPO Revised

23  Recommendation Letter ("USPO Rec. Letter") at 2-4.)  The government

24

_____

25        [1] The statutory maximum for counts 1-20 is 30 years'
imprisonment and five years of supervised release, and 20 years'
26  imprisonment and three years of supervised release for count 26.
(PSR ¶¶ 136, 140-142.)  As such, the government and USPO recommend a
27  term of 262 months' imprisonment (262 months on counts 1-20, and 240
months on count 26, all served concurrently), and five years of
28  supervised release (five years on counts 1-20, and three years on
count 26), all served concurrently.  (USPO Rec. Letter at 2-4.)

1  and the USPO also recommend the Court order defendant to pay

2  $16,464,071.26 in restitution to the U.S. Small Business

3  Administration ("SBA") and PPP lenders (PSR ¶ 149), the special

4  assessment of $2,100, and order the forfeiture of the property

5  identified in the jury's special verdict from as to defendant (ECF

6  648).  (USPO Rec. Letter at 1-2; see also Exhibit 1 (attached to the

7  Decl. of Catherine Ahn ("Ahn Decl.")) (filed under seal) at 1-2.)[2]

8  **II.  RELEVANT FACTUAL AND PROCEDURAL HISTORY**

9      **A.  Defendant's Charges, Convictions, and Motions**

10      On March 9, 2021, a grand jury returned a first superseding

11  indictment against defendant and seven co-defendants, charging

12  conspiracy to commit bank fraud and wire fraud, wire fraud and bank

13  fraud, aggravated identity theft, and conspiracy to commit money

14  laundering.  (ECF 154 (First Superseding Indictment).)  The

15  conspiracy began in March 2020 until at least August 2020, during

16  which Terabelian and her co-conspirators sought, received, and

17  laundered the fraudulent loan proceeds through numerous accounts,

18  including Terabelian's own personal bank account, as well as accounts

19  in the names of the false and synthetic business and individual

20  identities created and used in the fraud.  (Id.)  The end of the

21  money trial frequently led, however, to Terabelian and her husband,

22  ending up in real estate purchased in either their own names or

23  identities used by defendant and her husband ("Viktoria Kauichko" and

24  "Iulia Zhadko"), as well as gold coins, luxury watches, fine

25  furnishings, and jewelry found in their home.  (See e.g., GEX 115

26  (loan tracing summary chart); 6/17/2021 A.M. Tr. 93:17-25, 100:14-

27  

28      [2] The intended and actual losses for defendants Richard Ayvazyan and Marietta Terabelian are lower because they include fewer loans.

105:16 (Testimony of Caitlin Bowdler on gold coins, watches, and jewelry found at the Topeka residence); 6/17/2021 P.M. Tr. 33:1-33:20, 39:2-10, and 43:7-44:17 (Testimony of Anthony Farrar).)

On June 15, 2021, defendant and three of her co-conspirators – husband Richard Ayvazyan, brother-in-law Artur Ayvazyan, and his cousin-in-law, Vahe Dadyan - went to trial.  Defendant was convicted of the fraud and money laundering conspiracies (counts 1 and 26), wire fraud and bank fraud (counts 2 through 20), and acquitted on count 22, charging her and Richard Ayvazyan with aggravated identity theft related to her father Nazar Terabelian's name and California driver's license number, during and in relation to count 11.  (ECF 644, Redacted Verdict Form; see also PSR ¶¶ 1-7.)

The jury further heard testimony regarding a Wells Fargo debit card found in defendant's wallet in October 2020, when defendant was stopped on her way back from Turks and Caicos.  (6/16/2021 P.M. Tr. 97:7-98:23 (Testimony of Customs and Border Patrol ("CBP") Officer Theodora Louissant).)  The card was in the name of Viktoria Kauichko, a synthetic identity used on many of the fraudulent PPP and EIDL applications and banks accounts used to launder the fraudulent loan proceeds.  (GEX 76a; see also image 1, supra.)



**Image 1.** Photograph of "Viktoria Kauichko" debit card found in defendant's wallet inside her purse at Miami Airport (produced to defense as DOJ PROD 23706) (redacted).

1    The government also presented evidence of defendant's phone

2    calls following her arrest, during which defendant stated, "you know

3    the charges" (GEX 50e at 2), gave repeated instructions to "clean the

4    house as much as you can" (GEX 50b at 2), "clean the house as much as

5    you can, everything" (GEX 50e at 2) and "whoever calls, whatever they

6    say, you shouldn't say anything to anyone" (GEX 50b at 2).  Defendant

7    did not testify at trial.  During closing arguments, however, counsel

8    conceded that the calls "make[] her look guilty" and that she was

9    "asking for help."  (6/24/2021 A.M. Tr. at 107:6 and 107:11-13.)

10    Following defendant's convictions, defendant joined in her

11    husband's motions for a judgment of acquittal and a new trial.  (ECF

12    683 and 691.)  Among other things, defendants argued that the

13    government did not sufficiently tie the forfeited watches and

14    $451,185 in cash found in the bushes of defendant and Richard

15    Ayvazyan's Topeka residence (see images 2 and 3) to specific

16    transactions or PPP/EIDL funds.  (ECF 875 (Order) at 8, ECF 648

17    (Forfeiture Special Verdict Form).)[3]

 

**Image 2.** Photograph of bags of cash found in bushes outside the Topeka residence on November 5, 2020 (produced to defense as DOJ PROD 22573).

**Image 3.** Photograph of cash in the bags found in the bushes outside the Topeka residence on November 5, 2020 (produced to defense as DOJ PROD 22575).

---

[3] The government has also manually lodged with the Court videos taken during the search of the Topeka residence.  (Ahn Decl. Exhibit 2 (manually lodged and filed under seal).)  As previously briefed, the government began the execution of the search of other co-

*(footnote cont'd on next page)*

4

The government opposed (ECF 790), and on August 20, 2021, the Court denied defendants' motions, pointing to the "substantial circumstantial evidence" and finding that the jury's verdict was reasonable.  (ECF 875 at 8-9.)  As support, the Court pointed to the evidence presented at trial:

> The cash at issue here was discovered at a home purchased with proceeds of PPP and EIDL fraud (i.e., 4910 Topeka) where other proceeds of PPP and EIDL fraud (e.g., gold coins and luxury watches) were also discovered.  Similarly, hundreds of thousands of dollars (aside from the two watches with direct links to PPP and EIDL funds) were transferred from "Viktoria Kauichko" (i.e., the alias used by Marietta Terabelian and Richard Ayvazyan in furtherance of PPP and EIDL fraud) to the companies that sold the luxury watches.

Id. at 9.

**B.   The PSR, Objections, and the Defense Sentencing Position**

The UPSO filed its initial PSR on August 30, 2021 (ECF 890), a first addendum in response to defendant's objections (filed under seal) and the government's response, and issued a second addendum and a revised PSR on November 8, 2021, which responded to objections

---

conspirator locations at approximately 6:00 a.m. on November 5, 2020, before arriving at the Topeka residence, and defendant Terabelian had likely been notified.  (ECF 207 at 15 and ECF 188 at 16.)  At approximately 7:06:34 a.m., the first video shows a slender individual with long blonde hair tied in a ponytail (consistent with defendant Terabelian), wearing a light gray top and gray pants, walk by the side of the Topeka residence towards the bushes at the rear corner of the building.  At approximately 7:06:41, the individual appears to be holding a light-colored bag in her right hand as she walks towards the bushes.  At approximately 7:46:49 a.m., the individual can be seen handling the light-colored bag at the base of the bushes.  At approximately 7:06:58, the individual can be seen apparently inspecting the area, before walking back towards the front yard without the light-colored bag.  On the second video, at approximately 7:23 a.m., law enforcement vehicles can be seen arriving.  At approximately 7:24:22 a.m. a door opens and, at 7:24:36, the individual (now in dark pants), can be seen running along the side of the house, away from the corner where the aforementioned bushes were, towards the front yard.  Defendant was later identified as the individual who ran around house, where she was met by arriving agents.  (ECF 188 at 16.)

5

raised in defendant's sentencing position, filed under seal on November 1, 2021.  (See ECF 965 (Govt. Response to the Initial PSR), ECF 1126 (First Addendum to the PSR ("First Addendum")), ECF 1126 (Second Addendum to the PSR ("Second Addendum"), and ECF 1125 (PSR).) Defense counsel's sentencing position argued, among other things, that no loss-based enhancements should apply, and the inclusion of loans as relevant conduct would need to be considered under a "clear and convincing" basis.  (Def. Sent. Pos. at 3.)  Defense did concede that, in the alternative, a loss of up to $249,807 was foreseeable to defendant due to funds in that amount flowing through her personal bank account.  (Id.)  Defense further conceded that if this Court found defendant had absconded, a +2 enhancement for obstruction of justice would apply.  (Id. at 7.)

The above concessions, combined with defendant's conviction for conspiracy to commit money laundering in violation of 18 U.S.C. § 1956, and a reduction of 3 offense levels for mitigating role, yielded a total defense recommendation of 18 offense levels.  Neither the defense nor the government objected to the PSR's calculation of defendant's criminal history category as I, despite defendant's previous conviction for conspiring, with Richard Ayvazyan, to commit bank fraud in 2011.  (PSR ¶¶ 108-110.)  Defense argued for a below-guidelines sentence of 24 months' and three years of supervised release.  (Id. at 8-12.)

In the First Addendum, the USPO concurred with the government's recommendation that an obstruction of justice enhancement should apply, and, among other things, maintained that defendant Terabelian did not qualify for a mitigating role reduction because she was not "substantially less culpable than the average participant."  (First

Addendum at 2-3.)  In the Second Addendum, the USPO disagreed with defense counsel's arguments regarding loss and relevant conduct, the application of a mitigating role reduction, and defense counsel's objections to the additional enhancements.  (Id. at 1-4.)  The resulting PSR calculated an overall offense level of 39 – an increase of +2 offense levels from the initial PSR as a result of applying the vulnerable victims enhancement pursuant to U.S.S.G. § 3A1.1(b)(1).  (PSR ¶¶ 93-95 and 104.)  The government concurs with the offense level calculation in the revised PSR, yields an advisory guidelines range of 262 to 327 months' imprisonment.[4]

The government and the USPO further concur on the sentencing recommendation of 262 months' imprisonment and five years of supervised release, along with restitution of $16,464,071.26 and payment of the $2,100 special assessment.  (USPO Rec. Letter at 1-4.)

## III. THE COURT SHOULD ADOPT THE PSR AND GOVERNMENT'S RECOMMENDED GUIDELINES CALCULATION

### A. The Conspirators' Attempts to Obtain Approximately $20.1 Million in Fraudulent Loans and Launder the Received Funds was Reasonably Foreseeable to Defendant

#### 1. A Preponderance of the Evidence Standard Applies at Sentencing Based on Clear Ninth Circuit Precedent

Factual findings underlying sentencing enhancements are generally considered under a preponderance of the evidence standard. United States v. Riley, 335 F.3d 919, 925 (9th Cir. 2003).  However, defense counsel urges this Court to apply a clear and convincing standard in determining the scope of relevant conduct.  (Def. Sent.

---

[4] As further described below, while the government concurs with the application of a +2 enhancement pursuant to U.S.S.G. § 2B1.1(b)(11), the government recommends that it be applied on the basis of authentication features rather than means of identifications.  (See PSR ¶ 90(e) and infra at 17-18.)

Pos. at 3.)  This conflicts with clear and repeated Ninth Circuit holdings on the standard as applied to conspiracy cases.  None of the cases relied on by defense involved convictions for conspiracy where the proposed scope of relevant conduct fell within the detailed scope of charges.  See United States v. Parlor, 2 F.4th 807, 810 (9th Cir. 2021) (guilty plea to one count of felon-in-possession of a firearm) and United States v. Jordan, 256 F.3d 922, 923-924 (9th Cir. 2001) (guilty plea to one count of bank robbery).  This is a critical distinction because the Ninth Circuit has consistently held that, among other things, the use of uncharged conduct to enhance defendant's sentencing raise due process concerns that trigger the clear and convincing standard.  See e.g., United States v. Harrison-Philpot, 978 F.2d 1520, 1523 (9th Cir. 1992).  Those considerations simply do not apply where the "pre-sentence report simply calculated the sentencing range for conspiracy," which "involves no 'enhancement' of the sentence."  Id.; see also Riley, 335 F.3d at 926-927 (applying preponderance to enhancements that fall within the scope of the conspiracy).

The Ninth Circuit reaffirmed this approach in United States v. Hymas, 780 F.3d 1285 (9th Cir. 2015), where the Court applied the preponderance standard to loans that fell within the scope of the charged and convicted wire fraud count, and clear and convincing to losses from other loans.  780 F.3d at 1290-1291.  The Court reviewed prior precedents and observed that losses from a conspiracy "need not be proven by clear and convincing evidence because the defendants had an opportunity at trial to challenge evidence of the fraud conspiracy."  Id. (citing United States v. Treadwell, 593 F.3d 990, 1001 (9th Cir. 2010) (overruled on other grounds in United States v.

*Miller*, 953 F.3d 1095 (9th Cir. 2020), United States v. Berger, 587 F.3d 1038, 1048-1049 (9th Cir. 2009), and United States v. Armstead, 552 F.3d 769, 777 (9th Cir. 2008).)  The Court should apply a preponderance of the evidence standard at sentencing.

> 2. <u>The Court Should Adopt the Findings of the PSR with Respect to the Scope of Defendant's Relevant Conduct</u>

At sentencing, a defendant is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense."  United States v. Lloyd, 807 F.3d 1128, 1142-45 (9th Cir. 2015) (citing U.S.S.G. § 1B1.3(a)(1)(B)). Defendants are accountable for the conduct of co-conspirators that are: "(i) in furtherance of the jointly undertaken criminal activity; and (ii) reasonably foreseeable in connection with that criminal activity."  Id. (citing Treadwell, 593 F.3d 990, 1002 (9th Cir. 2010) and United States v. Blitz, 151 F.3d 1002, 1012 (9th Cir. 1998)).  . The district court need not "proceed item-by-item through a complete list of all losses attributed to a criminal conspiracy"; rather, it should consider "'the scope of the criminal activity the particular defendant agreed to jointly undertake.'" Blitz, 151 F.3d at 1012-13 (quoting U.S.S.G. § 1B1.3, cmt. n. 2).

Defendant's position on the scope of relevant conduct depends on the mistaken argument that she should only be held accountable for two transactions involving fraudulent loan proceeds that went through defendant's personal bank account.  (Def. Sent. Pos. at 3.)  The Court already rejected a similar argument when sentencing defendant's

co-defendant, Vahe Dadyan, and it should reject it again, in accordance with the evidence and Ninth Circuit precedent.

Defendant's own statements and actions reveal her substantial role and knowledge of the foreseeable scope of the fraud and money laundering conspiracies for which she was convicted. First, far from having almost no knowledge or role in the conspiracies as defense claims, defendant used her own personal account to launder fraudulent loan proceeds. (GEX 115.) These funds were sent to her from accounts in the names of convicted co-conspirators and businesses, whose names were used to seek and obtain fraudulent PPP and EIDL loans. (Id. at 7.) Specifically, on June 17, 2020, defendant's personal bank account received $150,000 from co-defendant Edvard Paronyan's Redline Auto Collision account, after co-defendant Paronyan received more than $180,000 in fraudulent loan proceeds. (Id.) On June 19, 2020, defendant's personal bank account received an additional $100,000 from an account in the name of A. Grigoryan and G&A Diamonds, only three days after that account had received $144,900 in fraudulent loan proceeds. (Id.) The A. Grigoryan G&A Diamonds loans were related to co-defendant Manuk Grigoryan. (See ECF 436 (Grigoryan Plea Agreement) ¶ 15.) Following the receipt of $250,000 in traceable, fraudulent loan proceeds, $565,000 was wired to Encore Escrow Company on June 22, 2020. (GEX 89 at 25 (Bank of America records for Terabelian account x1475) and GEX 115 at 7.)

These transfers are not the only time defendant's personal account records reveal her role in executing the fraud and money laundering conspiracies. On the same day that she received the $100,000 from the A. Grigoryan G&A Diamonds account, co-defendant Manuk Grigoryan sent her an additional $25,000 from his J.P. Morgan

Chase account.  (GEX 115 at 12 and GEX 89 at 23.)  Similarly, on July 8, 2020, defendant received $25,000 from "Fiber One Media."  (GEX 89 at 13.)  Fiber One Media is one of multiple businesses associated with Viktoria Kauichko, along with the Runyan Tax Service Bank of America account.  (GEX 116 at 1.)

The evidence found with and possessed by defendant further support her knowledge of the foreseeable scope of the conspiracy. Defendant was found with direct and personal possession of a Wells Fargo debit card bearing Viktoria Kauichko's name.  In text messages with luxury watch dealer Anthony Farrar, defendant's husband Richard Ayvazyan identified Fiber One Media and Viktoria Kauichko as "my wife's info" (GEX 37c at 1).  Images found on her husband's and her own phone further connected her to Fiber One Media, a business used to submit numerous fraudulent PPP and EIDL loan applications and launder the proceeds.  On his phone, Richard Ayvazyan possessed images of credit cards in the name of Susana Mkrtchyan and a check in the name of "Susanna Mkrtchyan DBA Fiber One Media" (GEX 19c), while an image found in defendant's own phone displayed the name Susanna Mkrtchyan, "#ID CA" followed by a string of numbers, and "Fiber One Media" (GEX 16b).  (See also ECF 549 at 3-5.)  Similarly, Viktoria Kauichko and Fiber One Media were associated with the same Canoga Apartment address used for the Anton Kudiumov identity and business used to submit additional EIDL and PPP loan applications, loan applications submitted in the name of Viktoria Kauichko shared commonalities with applications submitted in the names of numerous other identities used in the fraud and money laundering conspiracies. (GEX 116 at 1-2, 5, and 7.)

Defendant could also foresee the scope of the conspiracy through the unlawful use of the fraudulent loan proceeds, particularly since a significant amount of money went to support defendant's own lavish lifestyle.  The fraudulent proceeds defendant received in her personal bank account did not end there; on June 25, 2020, three days after receiving hundreds of thousands of PPP and EIDL money, defendant wired more than half-a-million dollars to Encore Escrow to purchase a $3.25 million home.  (GEX 89 at 25 and GEX 115 at 7.) Just fifteen days after they closed on that luxury home, defendants closed on yet another, $600,000 residence purchased in the name of Viktoria Kauichko.  The money for that purchase was provided, in part, by PPP and EIDL loan proceeds laundered through the Anton Kudiumov and Redline Auto account and the Viktoria Kauichko account, as well as an additional account in the name of Anton Kudiumov.  (GEX 115 at 6.)  In August 2020, yet another Viktoria Kauichko account was used to receive $74,616 from her deceased father's Mod Interiors account - which itself had received $384,000 in fraudulent loan proceeds – in order to purchase "imported fine furnishings" from Italy 2000.  (GEX 115 at 9.)

Defendant's own statements following her arrest also reveal her actual knowledge of her and her co-conspirators' criminal conduct. In October 2020, after her arrest, defendant signaled to an individual on the receiving end of her phone call that "you know the charges" and twice instructed, by phone, that the other party should "clean the house as much as you can."  (GEX 50e at 2 and GEX 50b at 2.)  Defendant again attempted to obstruct justice and hide or destroy evidence when law enforcement began executing residential search warrants in November 2020.  On that day, approximately an hour

after law enforcement had begun executing searches at other locations, including the home of her brother- and sister-in-law Artur Ayvazyan and Tamara Dadyan, an individual matching defendant's description can be seen taking items to the bushes outside of her house that were later revealed to hide approximately $451,185 in cash. (See Ahn Decl. Exhibit 2 and fn. 3, supra.) The footage later indicates she ran by those bushes on her way to the front yard when law enforcement arrived at the Topkea residence. (Id.) Agents found defendant's phone dropped in the area she ran by, which revealed additional evidence of her connection to the conspiracies (GEX 16b).

The aforementioned evidence supports the conclusion that the conduct of defendant's co-conspirators in furtherance of the fraud and money laundering conspiracies was reasonably foreseeable to defendant under a preponderance of the evidence standard, and she should be held accountable for the full foreseeable scope of those conspiracies, as described in Ahn Decl. Exhibit 1.[5]

**B.   The PPP Lenders are Victims under Ninth Circuit Precedent**

Under U.S.S.G. § 2B1.1(b)(2)(A)(i), a +2 enhancement should be applied if the offense involved ten or more victims. A victim is defined as "any person who sustained any part of the actual loss determined under subsection (b)(1)," where the term "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense" and "pecuniary harm" Pecuniary harm" is defined as "harm that is monetary or that otherwise is readily measurable in money. U.S.S.G. § 2B1.1, cmt. App. Note 1 and 3(A)(i), (iii).

---

[5] The intended and actual loss calculations for defendants Richard Ayvazyan and Marietta Terabelian are lower because they include fewer PPP/EIDL loans.

In the instant case, twelve PPP lenders and the SBA disbursed $16,464,071.26 in PPP and EIDL funds for which defendant should be held accountable.  (See Ahn Decl. Exhibit 1 at 1-2; see also First PSR Addendum at 4 and PSR at ¶ 90(c).)  From a straightforward factual point of view, the enhancement applies because these twelve PPP lenders and the SBA did, in fact, disburse funds and sustained a portion of the actual loss for defendant.  As indicated in the government's attached loss tables and the PSR, the SBA is not seeking reimbursement of the entire amount of funds disbursed.  (See Ahn Decl. Exhibit 1 at 2 and PSR ¶ 149.)  Rather, the SBA's "due and owing" restitution amount is only $5,589,900 of the approximately $16.4 million in fraudulent loans disbursed.  (PSR ¶ 149.)

In addition, even if the SBA had reimbursed the lenders – which the most up-to-date figures do not support – this would not necessarily exclude the twelve PPP lenders from being recognized as victims.  As articulated by the Ninth Circuit in United States v. Pham, 545 F.3d 712 (9th Cir. 2008), even victims whose most immediate and direct loss were reimbursed could still qualify as victims for the purposes of U.S.S.G. § 2B1.1(b)(2).  In that case, ninety-five individual victims had bank accounts that were compromised as part of the fraud; however, once the individuals discovered their accounts had been compromised, their accounts were restored and the banks absorbed the losses.  Id. at 715-716.  Defendant argued that the individual accountholders should be not included in the number of victims calculation because their banks had absorbed the direct loss to their bank accounts.  The district court rejected defendant's argument, pointing to the losses and harms incurred by the individual accountholders in seeking to get their accounts restored.  Id. at

716.   The Ninth Circuit affirmed the district court's rejection of defendant's argument, stating:

> We therefore hold that where a bank fraud offense results in initial losses by bank account holder of the funds in their accounts and a more permanent loss of those same funds by banks or other financial institutions when those institutions reimburse the account holders, both the account holder and the banks have suffered harms that are "pecuniary" and "reasonably foreseeable" for purposes of the Guidelines' definition of "actual loss" that are sufficiently distinct from one another to avoid a double counting problem.

Pham, 545 F.3d at 718 (citations omitted).

Furthermore, as discussed in the government's motion in limine to exclude evidence of alleged victim negligence (ECF 358), and testified to by SBA witness Kathleen Littwin even though the SBA guarantees a PPP loan, there is no automatic transfer of funds from the SBA to the PPP lender.  (6/16/2021 A.M. Tr. 43:20-44:09; ECF 358 at 3-4.)  The PPP lender must go through an additional process of requesting the SBA pay out the guarantee, and it is possible that the SBA would refuse to do so.  (6/16/2021 A.M. Tr. 43:20-44:09.) Furthermore, the PPP lender may still sustain losses associated with the clawback of lender processing fees incurred as a result of an ineligible loan, and – as noted by Ms. Littwin - the guarantee itself could be rendered unavailable if, after reviewing the additional records the PPP lender is required to submit to the SBA to receive the guaranteed funds, the SBA determines that the PPP lender did not abide by due diligence and anti-money laundering requirements.  (ECF 358 at 3-4.)  In other words, the PPP lenders – regardless of whether the SBA provided them the guaranteed funds – still qualify as victims who suffered cognizable pecuniary harms under the holding of Pham.

15

1    The testimony of Justin Masterman from PPP lender Celtic Bank

2 further supports this conclusion.  Celtic Bank incurred time and

3 resource costs associated with the handling and processing of the

4 initial loan application; as he explained, the SBA required PPP

5 lenders to obtain, and process, uniform information from PPP

6 applicants in order to determine their eligibility.  (6/21/2021 A.M.

7 Tr. (Testimony of Justin Masterman) at 19:21-20:7.)  In addition, if

8 Celtic Bank learned that a fraudulent or otherwise ineligible loan

9 had been approved, Mr. Masterman testified that the bank would

10 attempt to recover the funds – in essence, recover the fraudulent

11 loan proceeds that had been disbursed by the PPP lender.  (6/21/2021

12 A.M. Tr. 24:06-11 and 24:19-22.)  This testimony supports the

13 conclusion that Celtic Bank would take action to limit its losses,

14 not simply seek a guarantee from the SBA.

15    As such, the Court should reject defendant's attempt to nullify

16 the victim status of the dozen PPP lenders whose money defendant and

17 her co-conspirators fraudulently sought and obtained, at direct cost

18 to those lenders, and apply the +2 enhancement for ten or more

19 victims.

20   **C.   The Court Should Adopt the Enhancements for Sophisticated
21        Means, Possession and Use of Authentication Features, and
         Decline to Apply a Mitigating Role Reduction**

22        1.   The Court Should Adopt the PSR's Recommendation that
23             the Sophisticated Means Enhancement Should Apply
               Pursuant to U.S.S.G. § 2B1.1(b)(10)(A)(i)

24    A +2 sophisticated means enhancement is applicable where "the

25 offense otherwise involved sophisticated means and the defendant

26 intentionally engaged in or caused the conduct constituting

27 sophisticated means," defined as "especially complex or especially

28 intricate offense conduct pertaining to the execution or concealment

16

1   of an offense." U.S.S.G. § 2B1.1(b)(10) and App. Note 9(B). As

2   detailed above, defendant and her co-conspirators used a complicated

3   web of accounts held in their real names, accounts held in the names

4   of synthetic and fake identities and their associated companies, and

5   used those accounts to launder fraudulent loan proceeds through

6   numerous accounts. (GEX 115.) The proceeds themselves were obtained

7   using the same real and false identities and businesses to apply for,

8   and obtain, PPP and EIDL loans. (GEX 116.) As such, this Court

9   should adopt the findings of the PSR and apply the +2 enhancement for

10  sophisticated means. (PSR ¶ 90(d).)

11              2.   <u>The Court Should Adopt a +2 Enhancement for Possession
                     or Use of an Authentication Feature Pursuant to</u>
12                   <u>U.S.S.G. § 2B1.1(b)(11)(A)(ii)</u>

13        As discussed in detail in the government's sentencing position

14  for Artur Ayvazyan (ECF 1133), the government concurs with the USPO

15  that a +2 enhancement under U.S.S.G. § 2B1.1(b)(11) should apply, but

16  recommends its application based on defendant's and her co-

17  conspirators' possession and use of authentication features, and/or

18  the production or trafficking of authentication features, rather than

19  means of identification. <u>See</u> U.S.S.G. § 2B1.1(b)(11)(A)(ii) or

20  (B)(ii) and ECF 1133 at 17-21 (citing <u>United States v. Ovsepian</u>, 739

21  Fed. Appx. 448 (9th Cir. October 5, 2018). Given defendant's receipt

22  of fraudulent loan proceeds from accounts in the names of individuals

23  and business entities used in the fraud using counterfeit California

24  driver's licenses bearing authentication features, and defendant's

25  actual and fraudulent possession of a Wells Fargo debit card in the

26  name of Viktoria Kauichko, an individual who had not been present in

27  the United States for years, that itself possessed authentication

28

                                    17

features (see Image 1, supra), the +2 enhancement for possession or use of an authentication feature applies.

### 3.   A Mitigating Role Reduction Should Not Apply

As discussed above, defendant's own actions and statements display her knowledge of and participation in the convicted offenses. The identity that she was found in possession of – Viktoria Kauichko – was used in numerous PPP and EIDL applications, and defendant's own and the Viktoria Kauichko accounts were used to receive and launder funds.  Mitigating role reductions apply to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 App. Note cmt. 3(A).  As explained by the USPO, "defendant's role in the offense was essential" and "she clearly understood the scope and structure of the conspiracy."  (First Addendum at 4.)  Given is not substantially less culpable than an average participant, the Court should follow the recommendation of the USPO and decline to apply a mitigating role reduction.  At the time of her arrest, defendant directed her co-conspirators to destroy the evidence of her crimes.  Two weeks later, when she was on pre-trial release and agents approached her house to search it, she attempted to hide evidence including around $450,000 in cash.  And, when she and her husband (whom she claimed was the mastermind) were convicted, she left her children and absconded with him.

### D.   The Court Should Apply the Vulnerable Victims Enhancement Pursuant to U.S.S.G. § 3A1.1(b)(1)

As discussed in detail in the government's sentencing position for Artur Ayvazyan (ECF 1133), the guidelines, the analytic approach adopted by the Supreme Court and the Ninth Circuit, and the specific

holdings of the unpublished opinion in United States v. Cuellar, 165 F.3d 918 (9th Cir. 1998) (unpublished), support application of a +2 vulnerable victims enhancement pursuant to U.S.S.G. § 3A1.1(b)(1). (ECF 1133 at 17-20.)  Importantly, the government's analysis of the relevant cases identify the families of the deceased individuals as vulnerable, since – as was the case for Nazar Terabelian, defendant's deceased father – families are less likely to monitor, detect, or respond to the use of their loved one's identity in the aftermath of their demise.  Id.

Defendant's use of and connection to the Viktoria Kauichko identities shows her knowledge and targeting of deceased individuals and foreign exchanges students.  The name Viktoria Kauichko was stolen from a Ukrainian foreign exchange student who had entered the United States just once, on May 25, 2011, and left on September 22, 2011 – the last time she was present in the United States.  (See GEX 44 and 6/16/2021 P.M. Tr. at 34:12-36:1 (Testimony of CBP Officer Nicholas Felando).)  As discussed in the PSR and in the government's sentencing position for Artur Ayvazyan, Kauichko's visitor status rendered her unusually vulnerable because her lack of presence, the time since her visit, and distance from the United States, made it unusually unlikely that she would be able to detect, and respond, to the fraudulent use of her identity.  (PSR ¶ 95, ECF 1133 at 17-20.)

Furthermore, the Runyan Tax Service account in Viktoria Kauichko's name further supports her knowledge of the use of her father's name and information.  For example, on July 29, 2020, a physical check for $20,000 from "Nazar Terabelian" dated July 24, 2020 was deposited into the Viktoria Kauichko and Runyan Tax Service account (GEX 1p at 55), even though defendant's father had died on

July 13, 2020 (GEX 75).  The Court may consider this conduct for the application of an enhancement at sentencing, even though defendant was acquitted of aggravated identity theft involving her deceased father.[6]  "[A] jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence."  United States v. Watts, 519 U.S. 148, 157 (1997) (per curiam); see also United States v. Mercado, 474 F.3d 654, 657 (9th Cir. 2007).  Therefore, the government respectfully recommends that this Court adopt the offense level calculated by the USPO and apply a two-level increase because defendant "knew or should have known that a victim of the offense was a vulnerable victim."  U.S.S.G. § 3A1.1(b)(1).

IV.  **THE GOVERNMENT'S SENTENCING RECOMMENDATION**

   A.   **262 Months' Imprisonment Is Sufficient But Not More than Necessary to Meet the Goals of 18 U.S.C. § 3553(a)**

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing identified in 18 U.S.C. § 3553(a).  United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008).  The advisory guidelines range provides the "starting point and . . . initial benchmark" for sentencing.  Molina-Martinez v. United States, 136 S. Ct. 1338, 1345 (2016) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)).

Under 18 U.S.C. § 3553(a), in arriving at the appropriate sentence, the Court should consider, among other factors, the nature and circumstances of the offense and defendant's history and

---

[6] Defendant was convicted of the underlying offense of wire fraud involving a fraudulent PPP loan submitted to PPP lender Newtek in the name of her father and the business Mod Interiors (count 11).

20

characteristics, § 3553(a)(1); the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense, § 3553(a)(2)(A); the need for the sentence imposed to afford adequate deterrence to criminal conduct, § 3553(a)(2)(B); the need for the sentence imposed to protect the public from further crimes of defendant, § 3553(a)(2)(C); and the need to avoid unwarranted sentence disparities, § 3553(a)(6).

 1. <u>Defendant's Essential Role in the Crimes, Prior Conviction, and Current Flight from Supervision Support the USPO and Government's Recommendation</u>

Defendant Terabelian played a critical role in a conspiracy to defraud PPP lenders and the federal government of COVID-19 disaster relief funds and launder the resulting proceeds. At trial, and in her post-trial briefings, defense repeatedly argued she should not be held accountable for her crimes because her husband was the mastermind, while she was a mother simply caring for her children. This characterization conflicts with the actual evidence and facts revealed by defendant's own actions, and does not support a variance from the guidelines calculation or a sentence different from the government and the USPO's recommendation.

As extensively discussed above, defendant Terabelian was not an unwitting beneficiary of the crimes for which she and her husband were convicted. Rather, she possessed direct evidence of the conspiracies' use of one of their key synthetic identities – the Viktoria Kauichko identity – and the business associated with her, Fiber One Media. (<u>See</u> GEX 16b and image 1, <u>supra</u>.) She attempted to hide evidence of her criminal conduct by directing the destruction or elimination of evidence following her arrest. (GEX 50b and 50e.) Surveillance video supports that, an hour after the residential

searches had begun, but prior to law enforcement entering her own home, defendant hid $451,185 in the bushes outside her home, where it was found by law enforcement during the search.  (See Ahn Decl. Exhibit 2 and fn. 3, and Images 2 and 3, supra.)  The phone bearing evidence of her prior knowledge of Fiber One Media was found similarly discarded outside her home.  (GEX 16b.)

Defense's attempt to paint defendant as an innocent bystander is further undercut by her history of committing similar criminal conduct.  Far from standing by as her husband brings in the family's fraudulent funds, defendant's prior conviction reveals her history of conspiring with that husband, using similar methodologies, to – as in this case – commit bank fraud through the submission of fraudulent loan applications.  This distinguishes defendant from co-defendants like Vahe Dadyan, with whom defense tries to draw favorable comparisons.

As detailed in the government's prior filings and the PSR, defendants were convicted of conspiring to commit bank fraud in a manner that share striking similarities to the current, convicted conduct.  (ECF 357 (Govt. Opposition to Motion in Limine to Exclude Prior Convictions) at 3-5, and 8; PSR ¶ 108.)  As part of their prior scheme, defendants submitted false and fraudulent information in a loan application by falsely inflating baseline numbers, and providing false documentation including false tax forms to substantiate those fraudulently inflated numbers.  (ECF 357 at 3-4.)  Defendant's prior sentence of three years' probation, which was terminated early, clearly did not afford adequate deterrence or protect the public from her future crimes.  If anything, the lesson that appears to have been learned is how to conduct a similar loan fraud conspiracy using more

names, more entities, and more co-conspirators, thereby inflicting greater harms with greater efficiency.

Defendant's history of attempting to evade responsibility for her conduct – from the calls, to the cash, to the flight – also reveals the hollowness of defense's argument for leniency based on her children.  This Court should not reduce her sentence to grant her more time with her children when she herself chose to leave them by absconding from supervision.  Far from supporting defendant's narrative that she is stay-at-home mother kept in the dark by Richard Ayvazyan, the actual record overwhelmingly demonstrates that defendant and Richard Ayvazyan are literally partners in crime – whose commitment to sustaining their lifestyle while avoiding accountability was prioritized over their commitment to a law-abiding life with their children.  The government does not doubt that defendant loves her children and her family, but her actions speak louder than counsel's arguments.  At the end of the day, her own, voluntary participation in criminal conduct, and subsequent flight, has led to their current estrangement.  A sentence of 262 months' imprisonment, followed by five years of supervised release, is necessary, but not more than sufficient, to meet the goals of 18 U.S.C. § 3553(a).  See 18 U.S.C. § 3553(a)(1), (a)(2)(B), (a)(2)(C).

> 2.  **Defendant's Crimes Occurred During, and Took Advantage of, an Unprecedented Economic Disaster to Fund a Lavish Lifestyle While Fellow Americans Were Suffering**

A sentence of 262 months' imprisonment and five years of supervision is further necessitated by the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.  18 U.S.C. § 3553(a)(2)(A).  Defendant and her co-conspirators sought more than

$20 million, and obtained more than $16 million, in fraudulent loans that intended to help small businesses, their owners, and their employees by exploiting the economic disaster caused by COVID-19.

The structure of PPP and EIDL programs were designed to facilitate the rapid deployment of funds to prevent, or at least slow, the tsunami of small businesses closing around the country and the resulting catastrophe of joblessness, homelessness, and other societal harms. (See 6/16/2021 A.M. Tr. 22:4-35:7 (Littwin Testimony emphasizing the focus on rapid deployment of funds).) The programs were designed to rely on the truthfulness of applicant certifications, which defendant and her co-conspirators exploited "to do the max we can now u understand" since "market Gonna crash." (GEX 10 at 7.) Rather than go to payroll, operating expenses, and other legitimate uses to support the continued viability of small businesses, the funds obtained by defendant were spent to support her lavish lifestyle, furnishing her newly purchased multi-million-dollar home, procuring jewelry, gold coins, and more. Defendant's conduct, her crimes of conviction, and the context in which it occurred all demand a significant sentence of 262 months' imprisonment and five years of supervision, as recommended by the USPO and the government, to meet the goals of 18 U.S.C. § 3553(a).

As such, defendant should be held accountable for her conduct and receive a guidelines sentence of 262 months' imprisonment, at the low-end of the advisory guidelines range. Such a sentence would be sufficient, but not more than necessary, to meet the goals of 18 U.S.C. § 3553(a). The sentence would consist of 262 months on counts 1 through 20, and 240 months on count 26, to be served concurrently. Similarly, a period of three years' supervision, as defense

recommends, is simply insufficient to afford adequate deterrence or protect the public.  As shown by defendant's prior sentence, a period of three years' supervision through probation did not deter her from committing the much more expansive set of crimes for which she faces sentencing before this Court.  Instead, the Court should impose a period of five years of supervised release, as recommended by the USPO, comprised of five years on counts 1 through 20, and three years on count 26, to be served concurrently, with the conditions recommended by the USPO.  (See USPO Rec. Letter at 2-4.)

### 3. Defendant Should be Held Accountable for $16,464,071.26 in Restitution and Forfeiture

In addition, the government respectfully asks the Court to hold defendant accountable for her foreseeable scope of the conspiracy, as described in Exhibit 1, and order payment of $16,464,071.26 in restitution to the twelve PPP lenders and SBA, as described in the PSR, and the special assessment of $2,100.  (Ahn Decl. Exhibit 1 at 1-2; PSR ¶ 149; Ahn Decl. Exhibit 1 at 1-2.)  Finally, the government asks the Court to order forfeiture consistent with the findings of the jury, and include an order forfeiting the property identified in the jury's special verdict form (ECF 648) in defendant's judgment and commitment order.

## V.   CONCLUSION

The government respectfully requests that the Court sentence defendant to 262 months' total imprisonment, five years of supervised release, order defendant to pay $16,464,071.26 in restitution and the $2,100 special assessment, and include the jury's forfeiture findings in defendant's judgment and commitment order.